465 A.2d 981

**Stephen M. SACKS, Appellant,**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF PUBLIC WELFARE, Appellee.**

Supreme Court of Pennsylvania.

Argued April 26, 1983.

Decided Sept. 23, 1983.

202

Stanley M. Shingles, Philadelphia, for appellant.

Stanley Slipakoff, Mary Alexine Reilly, Asst. Counsels, Philadelphia, for appellee.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

This case presents the question of under what circumstances a government employee may be disciplined because of his public statements which are critical of the government agency for which he works. The Supreme Court of the United States, addressing this problem, has stated:

> In *Pickering v. Board of Education,* 391 U.S. 563 [88 S.Ct. 1731, 20 L.Ed.2d 811] (1968), we stated that a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of

government employment. We also recognized that the State's interests as an employer in regulating the speech of its employees "differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.,* at 568 [88 S.Ct. at 1734]. The problem, we thought, was arriving "at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Ibid.* *Connick v. Myers,* —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Because in the present case appellant Sacks was speaking on a matter of public importance and did not impair the functioning of his agency beyond incurring the displeasure of his superiors, we reverse the Commonwealth Court and direct the Department of Public Welfare to reinstate Sacks with full pay and benefits for the period of suspension.

## I. FACTUAL SETTING OF THE CASE

This case began when Sacks, an employee of the Department of Public Welfare, gave a public address during the evening of October 4, 1978 to the Health Systems Agency of Southeastern Pennsylvania (HSA). HSA plans health care facilities in Southeastern Pennsylvania and establishes guidelines for health care costs. Membership of HSA consists of representatives of many, if not all, major health care delivery agencies in the region. On the evening of October 4, 1978 Sacks appeared at a public hearing conducted by HSA on a proposed plan for improving the quality of health care and reducing its cost. His comments, in pertinent part, are as follows:

Good evening. I am Steve Sacks. Professionally, I am a public administrator and an applied behavioral scientist. I am employed by the Commonwealth of Pennsylvania, and I am currently with the Department of Public Welfare. Suffice to say, I have been actively involved during the past ten years in Pennsylvania's efforts to modernize our health care system. During that time I have worked

with our highest public level as well as many representatives of our community agencies. So I need to point out that my remarks tonight are my own consumer's view, and parenthetically, I would like to point out that I am testifying as an individual tonight; I am expressing my own personal views.

Later on I will be disclosing some information not heretofore made public, and I want to point out that the information was obtained from sources outside the Department of Public Welfare, and especially outside the Southeastern Region.

. . . .

It is the topics of cost and availability of third-party payments to which the rest of my comments tonight apply.

. . . .

Medical Assistance and the HSA. Tonight I recommend that the Health Systems Agency of Southeastern Pennsylvania along with its counterparts throughout the state take the lead in promoting the local communities and state government to collectively clean up the Medical Assostance [sic] Program.

In Southeastern Pennsylvania numerous medical assistance frauds and financial abuses have arisen, which include payments for goods and services for drugs, physicians' fees, orthopedic shoes, pain machines, and nursing home care. In addition, it has been recently announced that the Department of Public Welfare will be unable to pay Medical Assistance bills after April 30, 1979, due to lack of budget.

There are many dedicated and highly competent employees in the Department of Public Welfare. In my opinion, however, some of the problems are beyond Medical Assistance management. For instance, there was a futile effort to establish a cost limitation program for hospital costs. An attempt was made to place a twelve percent cost increase limitation, and it was apparently ruled to be illegal because Title XIV of the Social Security Act provides for the payment of reasonable cost. What

needs to be done is probably to prescribe in detail those expense components which constitute reasonable cost and to establish objective criteria for the individual expense items. As an example, interest expenses on bonds for construction might be limited if alternative funding sources were developed, as I recommended earlier.

In another Medical Assistance area, one provider of services was apparently paid over three quarters of a million dollars in profits for supposedly non-profit work. Since July 1974 to the present time the Philadelphia Health Management Corporation has been the Medical Assistance contractor for providing child health screening. The service is called the Early Periodic, Screening, Diagnostic, and Treatment Program, EPSDT, and as of December 31, 1977, the Philadelphia Health Management Corporation, a non-profit corporation, has made an apparent profit of $768,000 solely from the child screening program.

I got this information from data obtained outside the Department of Welfare. The profits are clearly shown in the corporation's annual audited financial statements, and the amounts are earmarked as from the child screening program.

The $768,000 profit is of questionable propriety; in other words, an apparent ripoff. The funds should probably be repaid to Medical Assistance.

It should also be noted that eleven people were simultaneously members, both past and present, of the governing boards of the Philadelphia Health Management Corporation and the Health Systems Agency, or the Plan Development Committee. Also, at least two people were simultaneously connected with both the Department of Public Welfare and the Philadelphia Health Management Corporation.

The bottom line of the preceding is that the Health Systems Agency is in a strategic position to mobilize community support to collectively clean up the Medical Assistance Program. The HSA should assert itself in the Medical Assistance arena for Medicaid financial problems affect the ultimate outcome of the proposed plan.

On November 8, 1978 Sacks was informed by letter that he was suspended for ten days because of insubordination, reckless disregard for truth in public statements, failure to conduct himself in a manner that would bring credit to the agency, and acting in a manner which caused unfavorable publicity for the agency.[1] All of these charges were made as a result of Sacks' statements at the HSA meeting referred to above. The matter was then appealed to the Pennsylvania Civil Service Commission, which upheld the suspension. On appeal, the Commonwealth Court affirmed the order of the commission.

## II. THE PROCEEDINGS BELOW

### A

The Civil Service Commission upheld the suspension on the grounds that Sacks' conduct at the HSA hearing,

1. The reasons given for the suspension, in pertinent part, are as follows:
 1. Insubordination, in that your statements at the Health Systems Agency public hearing on October 4, 1978, and to the press, and your conduct on the job demonstrate such antagonism to the established policies of the Department of Public Welfare that they amount to insubordination, thereby jeopardizing the proper delivery to the public of the services performed by the Department through its employees. . . .
 2. Your statements at the above-mentioned meeting were made with reckless disregard for the truth. Your use of the term "Rip-Off" is accusatory, inflammatory, and irresponsible and connotes illicit motivation and intention.
 3. You violated the Department of Welfare's general principles of conduct when you failed to conduct yourself in a manner that will bring credit to the Commonwealth and promote good public relations for the Department of Welfare with the citizens of the State.
 4. You violated the Department of Welfare's general principles of conduct when you engaged in an activity which caused unfavorable publicity to and adversely effected [sic] the public's confidence in the integrity of the Commonwealth of Pennsylvania and the Department of Public Welfare. You chose to incite public suspicion and distrust by alleging profiteering and a "Rip-Off", while publicly acknowledging your awareness of the sensitive budgetary condition of the Department of Public Welfare which is unable to pay medical assistance bills after April 30, 1979.

 Although the first item in this letter refers to "conduct on the job," there is no substantial evidence that the suspension was based on anything beyond Sacks' public speaking.

while possibly motivated by the highest ethical principles, was effected in an irresponsible, and potentially injurious, manner. Appellant had good reason to know that any statements publicly made by an employe ... charging the appointing authority with misconduct, would have negative results upon that agency's public image.... The unreasonable failure of appellant to examine the facts prior to testifying on a highly sensitive matter must, in our opinion, stand as good cause for suspension.

The commission went on to state that its decision was based not only on the fact that detrimental remarks were made, but also on "the fact that the remarks were made under the false guise of authoritative expertise and contained, as noted previously, patently false insinuations."

Our review of the record indicates that these findings of fact are without substantial support. To begin with, a fair reading of Sacks' opening remarks does not suggest "the false guise of expertise." Secondly, it is not at all clear that Sacks' remarks contained "patently false insinuations."

The "patently false insinuations" referred to are Sacks' remarks that the $768,000 surplus was "a rip-off" and his implication that there was an impropriety involved in the joint involvement of department employees on the board of the PHMC and in the Department of Welfare. That the surplus existed and that the joint involvement occurred the agency does not dispute; it disputes that either was improper.

The essence of the agency's explanation of the contract which permitted a non-profit agency to accumulate a $768,000 profit from the work it performed for the agency was that negotiating such a contract was ultimately beneficial to the Commonwealth and to citizens served because although a surplus was accumulated, paying for medical examinations at a fixed rate per examination encouraged a larger volume of service and allowed the agency to renegotiate the contract periodically as costs went down because of volume. As to the joint membership on the board of the Philadelphia Health Management Corporation and employment by the

Department of Welfare, the agency explained that as part of the contract with the federal government under which PHMC was formed as a non-profit corporation, it was agreed that the Department of Welfare, because of its role as the agency which administrates Title XIX, the Medicaid Program, and other health care payors as well, might participate in the PHMC.

The Civil Service Commission apparently felt that the agency's explanation of the situation precluded criticism, for in its opinion, cited *supra,* the commission stated that Sacks would not have made his remarks had he not unreasonably failed to "examine the facts prior to testifying. . . ." However, the commission's speculation about Sacks' testimony may or may not be accurate. Since the testimony in question has two components—a fact component and a value or opinion component—and since the fact component of Sacks' speech was accurate, it is not possible to say that the value component necessarily would have changed had Sacks been in possession of supplementary information which was offered by the agency at the Civil Service hearing. Additionally, there is nothing of record to indicate that Sacks did not already know the agency's reasons, as they were asserted at the hearing, for the surplus and the joint involvement. Therefore, the commission's assertions that Sacks would not have testified as he did if he had been more careful is in error for two reasons: (1) Sacks' opinion may have remained the same if he had been in possession of supplementary information on the agency's position, and (2) there is nothing of record to indicate that he did not have this supplementary information.

In sum, Sacks' view that the surplus was improper and the joint involvement questionable was a value judgment on which reasonable minds could disagree. Furthermore, the subject matter of this value judgment, while it concerned matters of agency management, also, more importantly, concerned matters of substantial public interest. Subject to limitations which will be stated *infra,* it is permissible for a government employee to disagree with his agency

on matters of fiscal policy and to articulate that disagreement publicly. In *Pickering,* the United States Supreme Court commented on the right of a teacher to speak publicly on the school board's allocation of funds between educational and athletic programs:

> [T]he question whether a school system requires additional funds is a matter of legitimate public concern on which the judgment of the school administration, including the School Board, cannot, in a society that leaves such questions to popular vote, be taken as conclusive. On such a question free and open debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.

391 U.S. 563, 571–72, 88 S.Ct. 1731, 1736. *See also Chalk Appeal,* 441 Pa. 376, 384, 272 A.2d 457, 461 (1971). Is not Sacks in a similar position? He too is most likely to have "informed and definite opinions" as to the expenditure of Department of Welfare funds.

 Where the Commission erred was in not recognizing the value or opinion component of Sacks' speech. Sacks' facts are not really at issue in this case; rather it is his characterization of the facts that is "unacceptable." However, the First Amendment does not serve to protect only views that are universally accepted, or accepted by those in positions of power, or views which are innocuous. Such ideas have little need for protection. More importantly, the First Amendment serves to protect "[u]nconstrained discussion concerning the manner in which government performs its duties," *Connick v. Myers,* —— U.S. ——, ——, 103 S.Ct. 1684, 1697, and as this Court stated in *Chalk Appeal,* the best test of the truth of speech relating to public policy is acceptance in the competition of the marketplace of ideas. 441 Pa. at 384, 272 A.2d at 461.

## B

The opinion of the Commonwealth Court affirmed the Commission on the grounds that Sacks occupied a "sensitive position" and was duty bound to make a greater effort than he made to verify his erroneous information that the Philadelphia Health Management Corporation had financially exploited the Department of Welfare and that there was impropriety in some Welfare personnel's simultaneous joint work in both agencies. There was, therefore, the court concluded, substantial evidence that Sacks recklessly disregarded the truth in making public statements to the HSA.

To begin with, there is nothing of record to indicate that Sacks occupied a "sensitive position," except insofar as any employee who has knowledge of his agency's activities is in a sensitive position. Moreover, there is nothing of record to indicate that Sacks was reckless in his remarks. In fact, his testimony, which was uncontradicted, was that he had spent a great deal of time in researching and preparing the remarks made to HSA. Furthermore, as stated earlier, the agency does not contend that the surplus did not exist or the simultaneous joint work did not occur; it alleges only that in its view there were good reasons for these occurrences. It may be that Sacks was unaware of or that he misunderstood the reasons for certain agency actions, but this is not the stuff of which reckless disregard is made.

Fundamentally, the Commonwealth Court's opinion is based on the view that when a government employee comments on a matter "about which his position qualified him to speak with greater authority than any other taxpayer" he is obligated to make substantial efforts to ensure that his statements are accurate before publishing them.[2]

2. In the *Pickering* case, the United States Supreme Court stated: We are not ... presented with a situation in which a teacher has carelessly made false statements about matters so closely related to the day-to-day operations of the schools that any harmful impact on the public would be difficult to counter because of the teacher's presumed greater access to the real facts. Accordingly, we have no occasion to consider at this time whether under such circumstances a school board could reasonably require that a

However, because this case does not involve remarks that are especially related to Sacks' publicly acknowledged job function, we need not address the merit of the Commonwealth Court's view that remarks closely related to the speaker's position require particular care before they may be made with First Amendment protection. Sacks' identification of himself as a behavioral scientist and an employee of the Department of Welfare who had been involved in Pennsylvania's attempts to modernize its health care system over the last ten years does not lead a listener to believe that what he is about to hear will be based on knowledge necessarily related to Sacks' position. In fact, Sacks' introductory remarks specify that he intended to utilize information from sources outside the Department of Welfare.

■ Thus, we conclude that there is no substantial evidence to support the findings that Sacks was "reckless" in his preparation and delivery of public remarks; or that he spoke under the false guise of authoritative expertise; or that he made false insinuations.

## III. THE CALCULUS OF INJURY

### A

In *Pickering v. Board of Education,* in which a public school teacher wrote a letter to the editor critical of the school board's allocation of funds between education and athletics, and its failure to inform the public as to how the money was being spent, the Court rejected the idea that a teacher's public comments on school board policy which were *substantially correct* could be grounds for dismissal if they were sufficiently critical in tone. 391 U.S. at 570, 88 S.Ct. at 1735. The Court noted, however, that different considerations may become operative if the speaker occupied a position in which the need for confidentiality was great or in which criticism of a superior undermined the necessary close

teacher make substantial efforts to verify the accuracy of his charges before publishing them.
391 U.S. at 572, 88 S.Ct. at 1736.

working relationship between superior and subordinate. 391 U.S. at 570, n. 3, 88 S.Ct. at 1735, n. 3.

As to *false statements,* some of which were contained in Pickering's letter to the editor, the Court stated:

> The Board's original charges included allegations that the publication of the letter damaged the professional reputations of the Board and the superintendent and would foment controversy and conflict among the Board, teachers, administrators, and the residents of the district. *However, no evidence to support these allegations was introduced at the hearing.* So far as the record reveals, Pickering's letter was greeted by everyone but its main target, the Board, with massive apathy and total disbelief. The Board must, therefore, have decided, perhaps by analogy with the law of libel, that the statements were per se harmful to the operation of the schools.

391 U.S. at 570–71, 88 S.Ct. at 1736 (Emphasis supplied). The Court then went on to observe that the only way in which Pickering's letter may have had a per se detrimental effect would be if the interest of the school board were to be equated with the board member's own interests. On the facts of the *Pickering* case, the Court concluded that no such equation could be made. Moreover, the Court observed that Pickering's false statements would normally have had no necessary impact on the actual operation of the schools, apart from angering the board.

In *Connick v. Myers,* a case in which an assistant district attorney was discharged after she circulated a questionnaire among fellow workers concerning, *inter alia,* their attitudes toward supervisors and whether co-workers felt pressured to work on political campaigns, the Court addressed a question not posed by the *Pickering* case: what injury to the government employer is required when the speech activity at issue has only a limited First Amendment aspect:

> The limited First Amendment interest involved here does not require that Connick [the district attorney] tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working

relationships. Myers' discharge therefore did not offend the First Amendment. We reiterate, however, the caveat we expressed in *Pickering, supra* [391 U.S.] at 569 [88 S.Ct. at 1735]: "Because of the enormous variety of fact situations in which critical statements by . . . public employees may be thought by their superiors . . . to furnish grounds for dismissal, we do not deem it either appropriate or feasible to lay down a general standard against which all such statements may be judged."

—— U.S. at ——, 103 S.Ct. at 1694.

■ As the foregoing discussion indicates, there is a calculus of injury required in First Amendment government employee cases in which as the First Amendment interest in the speech rises, so does the government's obligation to react with caution, disciplining an employee, if at all, only when injury to the agency is more than speculative.

■ Assuming that the speech in question concerns matters of general public interest, the principles which we distill from the foregoing discussion are (1) as the public interest value of the speech increases, government's disciplinary action related to the speech activity will proportionately increase in difficulty of justification; (2) in most cases, *factually accurate but critical* statements made by a public employee may not be punished at all; (3) *false but harmless* statements also may not be punished if the government is unable to demonstrate that the statements were in some way injurious; (4) the *claim that false statements were per se harmful* requires an equation of the interests of the agency criticized with individuals who are in positions of authority in the agency, and whether such an equation will be made will depend on the nature of the speech in question.

## B

■ In clarification of these general principles, the Court has articulated a number of additional factors which it may be appropriate to consider in a given case when a govern-

ment employee is disciplined for speaking on a matter of public importance.[3] These additional factors, articulated in *Connick,* may include the following:

1. Whether, because of the speech, the government agency is prevented from efficiently carrying out its responsibilities;

2. Whether the speech impairs the employee's ability to carry out his own responsibilities;

3. Whether the speech interferes with essential and close working relationships;

4. The manner, time and place in which the speech occurs.[4]

—— U.S. at —— – ——, 103 S.Ct. at 1691–1694. In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Court implied that there were still other factors which, although they were not present in the *Pickering* case and were therefore not considered, might have affected the disposition of the case:

5. Whether the speaker was in a position in which the need for confidentiality was so great as to justify dismissal for even completely accurate public statements. 391 U.S. at 570, n. 3, 88 S.Ct. at 1735, n. 3.

6. Whether narrowly drawn grievance procedures required submission of complaints about the operation of the agency to superiors for action prior to taking complaints to the public. 391 U.S. at 572, n. 4, 88 S.Ct. at 1737, n. 4.

7. Whether a statement that was knowingly or recklessly false, if it were neither shown nor could reasonably be presumed to have harmful effects, would still be protected by the First Amendment. 391 U.S. at 574, n. 6, 88 S.Ct. at 1738, n. 6.

**3.** The Court in *Connick* explained that whether an employee's speech addresses a matter of public concern is determined by the content, form, and context of the speech as determined by the whole record. —— U.S. at ——, 103 S.Ct. at 1689–1691.

**4.** In the *Connick* case, Myers' questionnaire was distributed at the office.

Finally, the *Connick* Court pointed out that the context in which the employee decided to speak in the first place is a matter of importance:

When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office.

—— U.S. at ——, 103 S.Ct. at 1693. Thus, the motive of the employee plays an important role in the balancing process where it can be demonstrated that a public employee makes statements for a purely vindictive and malicious purpose.

## C

▮▮▮▮ Applying these general considerations to the analysis of a public employee First Amendment case, a court should consider:

 I. the public importance of the speech;

 II. the nature of the injury to the agency;

 III. factors which may mitigate or aggravate the injury to the agency.

As the public importance of the speech increases, the government's difficulty of justifying disciplinary action taken against the employee because of the speech will increase proportionately, and as the public importance of the speech decreases, the government's burden of showing injury before it may discipline an employee, for First Amendment purposes, will proportionately decrease. If the speech has no element of public importance, then the analysis will not apply, and the speech should be treated merely as an ordinary complaint about the work place.

## IV. ORDER

▮▮▮ Because there is no substantial evidence in support of the lower court's pivotal legal conclusions and because a review of the record indicates that Sacks' speech concerned matters of public importance which were expressed in substantially accurate terms and were of no demonstrated harm

to the agency, the judgment of the Commonwealth Court is reversed and the Department of Public Welfare is directed to reinstate Mr. Sacks for the period of his suspension with full pay and benefits.

LARSEN, J., concurs in the result.