# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Rachel L. Carr,                                  :
                        Petitioner    :
                                              :
                v.                               :   No. 380 M.D. 2017
                                              :   Argued:  May 8, 2018
Commonwealth of Pennsylvania,                    :
Department of Transportation and                 :
Commonwealth of Pennsylvania,                    :
State Civil Service Commission,                   :
                     Respondents   :


**BEFORE:  HONORABLE P. KEVIN BROBSON, Judge**
**             HONORABLE ELLEN CEISLER, Judge**
**             HONORABLE DAN PELLEGRINI, Senior Judge**


**OPINION BY JUDGE BROBSON       FILED:  June 12, 2018**

Before this Court is the petition for review (Petition) of Rachel L. Carr (Carr), which invokes this Court's original and appellate jurisdictions, and an application for summary relief filed by the State Civil Service Commission (Commission).  In our appellate jurisdiction, Carr petitions for review of an adjudication and order of the Commission (Adjudication), which dismissed her challenge of the Commonwealth of Pennsylvania, Department of Transportation's (Department) termination of her employment.  In our original jurisdiction, Carr alleges that the Department and Commission violated her constitutional rights when the Department terminated her employment and the Commission failed to issue the Adjudication in a timely manner.  In response, the Commission filed an application for summary relief.  We now reverse the Adjudication and remand the matter to the Commission.  We also grant the Commission's application for summary relief as to the original jurisdiction claims and dismiss the Commission from this matter.

Following a promotion, Carr began working as a Roadway Programs Technician I within the Department on March 5, 2016. (Reproduced Record (R.R.) at 3a, 73a-74a.) As part of this promotion, the Department imposed upon Carr a 180-day probationary period of employment. (*Id.* at 3a.) On May 24, 2016, while Carr was off-duty and at home, she used her personal Facebook account to post a "rant" in a Facebook group "Creeps of Peeps." (*Id.* at 16a.) Carr, frustrated with the quality of school bus drivers in her area, posted the following:

> Rant: can we acknowledge the horrible school bus drivers? I'm in PA almost on the NY boarder [sic] bear [sic] Erie and they are hella scary. Daily I get ran off the berm of our completely wide enough road and today one asked me to t-bone it. I end this rant saying I don't give a flying shit about those babies and I will gladly smash into a school bus.

(*Id.*) Over the course of approximately five hours following her original post, Carr responded to comments from members of the Facebook group. In one response, Carr asked another member of the group: "If you see a vehicle coming perpendicular [to] you with no turn signal on, do you pull out from your stop sign anyways? [Let me know] when you're done [G]oogling perpendicular[.]" (*Id.* at 20a.) In another response, Carr stated: "Your children and your decision to chance them with a driver you've never been a passenger with is your problem. A vehicle pulls out in front of me or crosses the yellow line, that's their problem. A sedan, school bus or water truck. You're [sic] kids your problem. Not mine[.]" (*Id.* at 23a.) When one group member responded and suggested that Carr should be more concerned with the safety of the children, Carr reiterated that she cared about herself and her safety more so than the safety of the children. (*Id.* at 20a-22a.) Carr emphasized that she should not be forced to put herself at risk due to the unsafe driving of the school bus driver. (*Id.* at 21a.)

2

Thereafter, members of the Facebook group sent screenshots of her interactions to the Department's Facebook page, expressing concern with the content of Carr's statements. (*Id.* at 17a-19a.) Carr's Facebook profile identified the Department as her employer. (*Id.* at 14a.) The Department's human resources office thereafter scheduled a pre-disciplinary conference with Carr for May 27, 2016. (*Id.* at 89a-90a.)

At the pre-disciplinary conference, Carr admitted to posting the rant, but she asserted that her comments were taken out of context and that she was merely expressing her frustrations with the unsafe driving habits of local school bus drivers. (*Id.* at 26a.) Carr stated that she would not intentionally crash into a school bus, but that the poor driving of the school bus driver may necessitate her doing so to avoid injury to herself. (*Id.* at 27a.) Following the pre-disciplinary conference, the Department suspended Carr pending a further investigation. (*Id.* at 29a.)

By letter dated June 14, 2016, the Department terminated Carr's employment due to her inappropriate behavior. (*Id.* at 31a.) Carr filed an appeal with the Commission under Section 951(b) of the Civil Service Act[1] (Act). In so doing, Carr asserted that the Department discriminated against her in violation of Section 905.1 of the Act.[2] The Commission scheduled a hearing on the matter. (R.R. at 33a.)

---

[1] Act of August 5, 1941, P.L. 752, added by the Act of August 27, 1963, P.L. 1257, *as amended*, 71 P.S. § 741.951(b).

[2] Added by the Act of August 27, 1963, P.L. 1257, 71 P.S. § 741.905(a). Section 905.1 of the Act, relating to the prohibition of discrimination, provides:

> No officer or employe of the Commonwealth shall discriminate against any person in recruitment, examination, appointment, training, promotion, retention or any other personnel action with respect to the classified service because of political or religious opinions or affiliations because of labor union affiliations or because of race, national origin or other non-merit factors.

At the hearing, Carr presented her own testimony and that of Robert Chiappelli (Chiappelli), the Department's Human Resources Officer. The Department presented the testimony of Anthony Reda (Reda), its Labor Relations Supervisor.

Carr testified that during her new-employee orientation, Department representatives advised the new employees that off-duty conduct could negatively affect their employment, but Carr could not recall whether the discussion involved social media usage. (*Id.* at 128a-29a.) Carr testified that she never intended to crash into a school bus, and that her frustrations with the bus driver acted as the impetus for her Facebook post. (*Id.* at 120a, 122a-24a.) She asserted that her post did not affect her ability to perform her job. (*Id.* at 118a-19a.) She further asserted that she never thought her post would become such an ordeal, and she conceded that she could see how her post could concern members of the public. (*Id.* at 139a-40a, 142a.) Further, Carr also conceded that if she had the opportunity to do it all over again, she would not have posted the rant to Facebook. (*Id.* at 142a.)

Chiappelli testified that he is responsible for discussing work rules and policies at new-employee orientations. (*Id.* at 81a.) Chiappelli testified that, as part of this discussion, he explains to all new employees that off-duty activities could have an adverse effect on their employment, especially if that activity has a nexus to the Department. (*Id.* at 82a-83a.) Chiappelli stated that one of the Department's main goals is to ensure the safety of the traveling public, and Carr's comments undercut that goal. (*Id.* at 63a.) Chiappelli agreed that Carr's Facebook post likely had no effect on her ability to perform her job function, but he reiterated that her views were not in accord with those of the Department. (*Id.* at 53a, 56a, 63a, 97a-98a.) Further, Chiappelli added that the Department did

not treat Carr any differently than other employees in a similar situation. (*Id.* at 98a-99a.)

Reda concurred with Chiappelli that Carr's behavior, not her performance, is what led to her removal. (*Id.* at 157a.) Regarding Carr's Facebook post and its nexus to her employment with the Department, Reda testified that Carr's rant "gave the Department a black eye" in the eyes of the public. (*Id.* at 156a.) Expounding on this premise, Reda added that if Carr acted on her threat of crashing into a school bus, the Department could be exposed to liability for her actions. (*Id.*) Reda further asserted that the Department did not treat Carr any differently than other similarly-situated employees. (*Id.* at 159a.) In support of this assertion, Reda provided examples of when the Department removed other employees for similar inappropriate behavior. (*Id.* at 160a-62a.)

By Adjudication mailed on August 1, 2017, the Commission affirmed the Department's termination of Carr's employment and dismissed Carr's appeal. (Adjudication at 21.) In so doing, the Commission explained:

> Upon review of the record, the Commission finds [Carr] has not presented sufficient evidence to support her claim of discrimination or a violation of her First Amendment free speech. [Carr] has not presented any evidence to establish she was treated differently than any other probationary employee who made disparaging remarks bringing disrepute to the [Department] and its mission. The Commission finds the testimony of Chiappelli and Reda credible that [Carr's] Facebook remarks brought disrepute to the [Department] and raised issues of trust.

(*Id.* at 20.)

Carr then filed the instant Petition, invoking this Court's original and appellate jurisdictions. Carr's Petition contains three separate counts, all of which request relief in the form of this Court reversing the Adjudication and reinstating

5

Carr with back pay. Count I of Carr's Petition challenges the Adjudication in the Court's appellate jurisdiction. Count II of the Petition sets forth a claim in the Court's original jurisdiction against the Department, alleging that the Department violated Carr's free speech rights under the First Amendment of the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution.[3] Count III of the Petition sets forth a due process claim in the Court's original jurisdiction against the Commission, alleging that the Commission failed to provide Carr adequate due process, in violation of Article I, Section 11 of the Pennsylvania Constitution.[4] Additionally, Count III seeks declaratory and injunctive relief in the form of an order

---

[3] Article I, Section 7 of the Pennsylvania Constitution, relating to freedoms of speech and the press, provides:

> The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

Pa. Const. art I, § 7.

[4] Article I, Section 11 of the Pennsylvania Constitution, relating to open courts and suits against the Commonwealth, provides:

> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

Pa. Const. art I, § 11.

6

declaring that the Commission violated Carr's due process rights and compelling the Commission to comply with governing procedures in issuing decisions.

In response, the Commission filed an application for summary relief seeking dismissal of Carr's petition insofar as it attempts to set forth any original jurisdiction claims against the Commission.[5] By order dated October 23, 2017, this Court directed the parties to address the Commission's application for summary relief in their principal briefs on the merits,[6] and the Commission filed a brief addressing the original jurisdiction counts to the extent that they apply to the Commission.[7] The Department did not file an application for summary relief, although it did file a brief addressing the merits of Carr's appeal of the Adjudication. Similarly, Carr did not file an application for summary relief, although Carr filed a brief addressing the Commission's application and the merits of the appeal. Before proceeding to the merits of the appeal, we will first evaluate the Commission's application for summary relief.

As previously mentioned, Count II of Carr's Petition alleges that the Department violated Carr's free speech rights under the First Amendment of the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution. In its application for summary relief, the Commission correctly avers that Count II of

---

[5] An application for summary relief may be granted if a party's right to judgment is clear and no material issues of fact are in dispute. Pa. R.A.P. 1532(b). When ruling on an application for summary relief, "we must view the evidence of record in the light most favorable to the non-moving party and enter judgment only if there is no genuine issue as to any material facts and the right to judgment is clear as a matter of law." *Cent. Dauphin Sch. Dist. v. Dep't of Educ.*, 598 A.2d 1364, 1366-67 (Pa. Cmwlth. 1991).

[6] When referencing the parties' principal briefs on the merits, it appears that the Court intended to refer to the merits of the *appeal*.

[7] The Commission is not a party to the appellate jurisdiction portion of this matter.

7

the Petition alleges violations on behalf of the Department only and does not allege any violation on behalf of the Commission, which Carr does not dispute.

Count III of Carr's Petition alleges that the Commission failed to provide Carr adequate due process in violation of Article I, Section 11 of the Pennsylvania Constitution. Specifically, Carr alleges that the Commission violated her due process rights by failing to report its findings from Carr's appeal hearing within 90 days, as required by Section 952(a) of the Act.[8] In support of her argument, Carr points out that the Commission held her appeal hearing on November 17, 2016, and did not report its findings until August 1, 2017—257 days after the Commission's hearing. Carr argues that this Court should read Section 952(a) as a mandatory provision, which would serve to invalidate any proceeding wherein the Commission fails to report its findings within 90 days. Carr argues that reading Section 952(a) as directory permits excessive delays in the Commission's reporting of its findings, and such delays undercut the stated purpose of the Act.[9] In response, the Commission argues that it did not violate Carr's due process rights, as it avers that this Court has previously determined that the 90-day provision in Section 952(a) is directory, not mandatory.

---

[8] Added by the Act of June 26, 1989, P.L. 47, 71 P.S. § 741.952(a). Section 952(a) of the Act provides: "Within ninety days after the conclusion of the hearing described in [S]ection 951[ of the Act], the commission shall report its findings and conclusions to those parties directly involved in the action."

[9] Act of August 5, 1941, P.L. 752, *as amended*, 71 P.S. §§ 741.1-.1005. Section 2 of the Act, 71 P.S. § 741.2, outlines the purpose of the Act and provides:

Greater efficiency and economy in the administration of the government of this Commonwealth is the primary purpose of this act. The establishment of conditions of service which will attract to the service of the Commonwealth qualified persons of character and ability and their appointment and promotion on the basis of merit and fitness are means to this end.

Whether the Commission's failure to report its findings within 90 days invalidates the proceeding depends on whether Section 952(a) is mandatory or directory. *See Fishkin v. Hi-Acres, Inc.*, 341 A.2d 95, 99 n.5 (Pa. 1975) (stating that distinction between mandatory and directory statutory provisions lies in effect of noncompliance upon transaction or proceeding involved). In *West Penn Power Company v. Pennsylvania Public Utility Commission*, 521 A.2d 75 (Pa. Cmwlth. 1987), we explained the difference between mandatory and directory statutory provisions as follows:

> Whether a statute is mandatory or directory must be determined by considering legislative intent gleaned from review of the entire statute and from considering the nature and object of the statute and the consequences of the construction of it one way or the other. If the thing directed to be done is the essence of the thing required, the statute is mandatory. If, however, the statute merely directs that certain proceedings be done in a certain manner or at a certain time, it is directory. Failure to follow a mandatory statute renders the proceedings void, whereas failure to follow a directory statute does not.

*West Penn Power Co.*, 521 A.2d at 78 (internal citations omitted).

In *Baker v. Department of Public Welfare*, 588 A.2d 1337 (Pa. Cmwlth. 1991), this Court previously held that the 90-day provision in Section 952(a) of the Act is directory, not mandatory. In so holding, we opined:

> This Court has previously held that statutes which seek to impose time limitations on adjudicating tribunals are directory only. Such an interpretation is not only logical but almost compelled because otherwise the parties would bear the consequences for the adjudicating body's tardiness. In the context of this appeal this would amount to a "deemed decision" with complete disregard for the merit concept which forms the cornerstone of civil service law. For example, an employee who was removed for attacking a co-worker might need to be reinstated because the Commission's adjudication was not timely rendered.

9

And, from the other point of view, an employee denied a promotion because of racial or ethnic reasons would not be placed in the job because the Commission failed to act promptly. Such results would clearly be contrary to the Act's purpose of rendering personnel decisions on the basis of merit criteria. Accordingly, we conclude that the ninety-day provision in Section 952(a) [of the Act] must be read as directory and thus the adjudication is not invalid.

*Baker*, 588 A.2d at 1340-41 (internal citations omitted). Accordingly, we reject Carr's argument that the 90-day provision in Section 952(a) is mandatory.[10]

We now turn to Count I, which Carr filed in our appellate jurisdiction.[11] In Count I, Carr challenges the Commission's adjudication and order affirming her removal. In so doing, Carr essentially argues that the Commission erred as a matter of law by concluding that her speech did not qualify as protected speech, and the Commission should have concluded that the Department violated Carr's

---

[10] Despite this holding, the Court is nonetheless concerned with the extent of the Commission's failure to adhere to the 90-day provision found in Section 952(a) of the Act. In promulgating this provision, the General Assembly specifically designated 90 days as its expressed legislative intent of the reasonable time for the Commission to report its findings. Although failure to adhere to a directory provision does not invalidate the proceedings, it "does not mean that [the provision] is optional—to be ignored at will. Both mandatory and directory provisions of the legislature are meant to be followed." *Dep't of Transp., Bureau of Driver Licensing v. Claypool*, 618 A.2d 1231, 1232 (Pa. Cmwlth. 1992). While the Act seeks to render personnel decisions based on merit criteria, using nearly three times the statutorily prescribed time in order to do so appears excessive. To that end, we note that Carr was not without a remedy. At any time after the expiration of the 90-day window, Carr could have filed an action in mandamus to compel the Commission to report its findings. As previously held by this Court, the purpose of "maximum delay provisions having no deemed approval provision is to form the basis for an action in mandamus to compel the performance of official duties." *Appeal of Crossley*, 432 A.2d 263, 265 (Pa. Cmwlth. 1981).

[11] This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

10

constitutional rights when it terminated her employment for engaging in protected speech.[12] In response, the Department argues that the Commission correctly concluded that Carr's Facebook posts were not protected speech.

At the outset, we note Carr's status as a probationary employee and its relevance, or lack thereof, to the issue currently before us. "It is well established that a probationary status civil service employee does not enjoy the job security afforded to regular status employees who may be removed only for just cause." *Pers. Dep't, City of Phila., v. Hilliard*, 548 A.2d 354, 356 (Pa. Cmwlth. 1988). Section 603(a) of the Act, 71 P.S. § 741.603, provides, in part, that "[a]t any time during the probationary period, the appointing authority may remove an employe if in the opinion of the appointing authority the probation indicates that such employe is unable or unwilling to perform the duties satisfactorily or that the employe's dependability does not merit continuance in the service." This, however, is not a situation where Carr lost her position due to her ability or dependability. Instead, this is a situation where the Department terminated an employee for non-merit based activity. Although probationary status civil service employees do not enjoy the same job security as regular status employees, they still enjoy the same constitutional rights as their regular status counterparts. Accordingly, Carr's status as a probationary employee is of no consequence to the instant matter.

---

[12] Carr's Petition also sought to challenge four factual findings in the Adjudication, set forth as statements, as being unsupported by record evidence. Carr's brief provides no argument, however, supporting these challenges. Accordingly, these issues are waived. *See Tyler v. Unemployment Comp. Bd. of Review*, 591 A.2d 1164, 1167 (Pa. Cmwlth. 1991) ("When a claimant appeals an issue, but fails to address the issue in his brief, the issue is waived.").

11

Whether Carr's speech is constitutionally protected is a question of law.[13]  United States Supreme Court precedent has identified two inquiries to determine the constitutional protections accorded to public employee speech.  The first requires determining whether the employee spoke as a citizen on a matter of public concern.[14]  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563 (1968)).  Speech implicates a matter of public concern "if the content, form, and context establish that the speech involves a matter of political, social, or other concern to the community."  *Miller v. Clinton Cty.*, 544 F.3d 542, 548 (3d Cir. 2008) (citing *Connick v. Myers*, 461 U.S. 138, 140 (1983)).  "In contrast, speech on matters of purely private concern is of less First Amendment concern," because "[t]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press."  *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759-60 (1985) (internal quotations omitted).  When determining whether speech is of public concern, the speaker's motive is important but not dispositive.  *Azzaro v. Cty. of Allegheny*, 110 F.3d 968, 978 (3d Cir. 1997).

---

[13] Due to the lack of applicable jurisprudence from the courts of this Commonwealth, we will rely on federal jurisprudence for guidance in analyzing the issue of public concern.  Although our Supreme Court has analyzed a similar issue in *Sacks v. Department of Public Welfare*, 465 A.2d 981 (Pa. 1983), the focus of the inquiry did not involve whether the speech touched on a matter of public concern.  Rather, *Sacks* focused on analyzing the issue of when a public employee may be punished for speaking on a matter of public concern.  *Sacks*, 465 A.2d at 987.  *Sacks* offers little in terms of guidance as to the threshold inquiry of whether speech addresses matters of public concern.

[14] Here, it is undisputed that Carr spoke as a citizen and not as an employee.

12

If the answer to the first inquiry—whether the speech implicates a matter of public concern—is in the negative, the inquiry ends there. *Garcetti*, 547 U.S. at 418. Alternatively, if the answer is yes, the focus then shifts to the second inquiry, which asks "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* A government entity is granted broader discretion to inhibit speech when acting as an employer, but the restrictions it imposes "must be directed at speech that has some potential to affect the entity's operations." *Id.* In resolving this inquiry, a court must balance the employee's interest in engaging in free speech with the employer's countervailing interests, including the employer's prerogative of removing employees whose conduct impairs performance, concerns for the morale of the workplace, harmonious relationships among co-workers, and the regular operation of the workplace. *Connick*, 461 U.S. at 151.

With the foregoing in mind, we first must determine whether Carr's speech involved a matter of public concern. In asserting that her speech involved a matter of public concern, Carr argues that she commented on the "appropriateness and quality of local bus drivers, which is an important function of her local government." (Carr's Br. at 26.) In retort, the Department labels Carr's speech as an expression of personal frustration with a specific bus driver, and it argues that such speech only addresses matters of *private* concerns.

Here, the Commission determined that Carr's Facebook post did not touch on any matter of public concern. Further, the Commission noted that to whatever extent Carr's speech implicated a public concern, the Department's interests outweighed those of Carr. In so doing, the Adjudication provides:

> Moreover, the Commission is at a complete loss to find any reasonable public interest in a rant about harming

13

> children or a bus driver. [Carr's] remarks do not provide any educational information to the public or serve to inform them [sic] about any public matter. Furthermore, even if the Facebook rant contains an inkling of public interest, we find Chiappelli and Reda credible that [Carr] presented herself as a[] [Department] employee and her rant completely disregards the basic safety mission put forth in its mission statement. [Carr's] Facebook rant caused disruption to the [Department's] reputation and mission that outweighed [Carr's] interest in her free speech. Thus, [Carr's] Facebook rants do not constitute protected free speech.

(Adjudication at 19-20 (internal citations omitted).)

After reviewing the entirety of the content, form, and context of Carr's statements, we conclude that the Commission erred in determining that her statements did not address a matter of public concern. Although the sentiments within Carr's posts relating to purposefully colliding with a school bus are reprehensible, her original post and subsequent responses show an attempt to discuss her frustrations toward the poor driving habits of an individual entrusted to safely transport schoolchildren. After posting her comment, Carr can do very little to control how people will react. Carr's subsequent posts defending her position of crashing into a bus are largely a product of the Facebook group's reaction to her original statement. Had the other members of this Facebook group agreed with Carr that school bus drivers are unsafe at times and proceeded to engage in a substantive discussion to that end, there would be little question that her speech touched on a matter of public concern. Instead, the Commission judged Carr on the public's reaction to her post, as opposed to the substance of the speech itself.

Speech that is violent and seemingly provides little to the marketplace of ideas can still qualify as speech touching on a matter of public concern. In *Rankin v. McPherson*, 483 U.S. 378 (1987), a public employee, after hearing of an attempted

14

assassination on then-President Ronald Reagan, remarked "if they go for him again, I hope they get him" to a co-worker. Another employee overheard this remark and informed management. The public employee was fired for this comment and subsequently brought suit alleging a violation of her First Amendment rights. In concluding that her speech touched on a matter of public concern, the Supreme Court opined:

> Considering the statement in context, as *Connick* requires, discloses that it plainly dealt with a matter of public concern. The statement was made in the course of a conversation addressing the policies of the President's administration. It came on the heels of a news bulletin regarding what is certainly a matter of heightened public attention: an attempt on the life of the President. While a statement that amounted to a threat to kill the President would not be protected by the First Amendment, the District Court concluded, and we agree, that [the employee's] statement did not amount to a threat . . . . *The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.* "[D]ebate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."

*Rankin*, 483 U.S. at 386-87 (emphasis added) (internal citations omitted).

Even more similar to the instant case is *Grutzmacher v. Howard County*, 851 F.3d 332 (4th Cir.), *cert. denied*, 138 S. Ct. 171 (2017). In *Grutzmacher*, a paramedic for a fire department engaged in a series of Facebook posts while watching news coverage of a gun control debate. One of the paramedic's posts provided: "My aide had an outstanding idea . . . lets [sic] all kill someone with a liberal . . . then maybe we can get them outlawed too! Think of the satisfaction of beating a liberal to death with another liberal . . . its [sic] almost poetic . . . [.]" *Grutzmacher*, 851 F.3d at 338 (ellipses in original). The paramedic's employer

15

informed him that the post violated the employer's social media policy, and the paramedic subsequently deleted the post. Thereafter, in another Facebook post, the paramedic vented about the policy and his forced compliance therewith, stating "[a]ll it took was one liberal to complain." *Id.* at 339. The employer subsequently terminated the paramedic's employment. On appeal, the Fourth Circuit concluded that the paramedic's speech touched on a matter of public concern—gun control.

Here, just as in *Rankin* and *Grutzmacher*, the speech in question involved a matter of public concern. The public concern in *Rankin* involved the attempted assassination of the President, and the public concern in *Grutzmacher* involved gun control. Here, Carr's speech touched on the safety of schoolchildren and the traveling public. Although the manner in which Carr expressed her concerns is abhorrent, the controversial character of her statement is "irrelevant to whether it deals with a matter of public concern." *Rankin*, 483 U.S. at 387. The Commission, in concluding Carr's speech did not touch on matters of public concern, placed seemingly a singular focus on the caustic verbiage of Carr's speech, as opposed to the safety issue encompassed therein. The Commission, therefore, erred in concluding that Carr's speech did not touch on matters of public concern.

As we have concluded that Carr's speech touched on a matter of public concern, we now proceed to the second part of the analysis—balancing Carr's interest in engaging in her free speech with the Department's countervailing interests.[15]

As previously mentioned, if it is determined that the public employee's speech touched on a matter of public concern, a court must then evaluate whether

---

[15] We note that although the Adjudication provides that the Department's interests outweighed those of Carr, the Commission performed no analysis in coming to such a conclusion.

16

the government employer "had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418. In so doing, a court must "balance the employee's interest in engaging in free speech with the employer's countervailing interests." *Id.* The Supreme Court's public employee First Amendment jurisprudence has provided a non-exclusive list of factors to which a court may refer in resolving this inquiry. In *Sacks*, our Supreme Court, citing to *Pickering* and *Connick*, identified the following factors:

1. Whether, because of the speech, the government agency is prevented from efficiently carrying out its responsibilities;

2. Whether the speech impairs the employee's ability to carry out his own responsibilities;

3. Whether the speech interferes with essential and close working relationships;

4. The manner, time and place in which the speech occurs[;]

   . . . .

5. Whether the speaker was in a position in which the need for confidentiality was so great as to justify dismissal for even completely accurate public statements[;]

6. Whether narrowly drawn grievance procedures required submission of complaints about the operation of the agency to superiors for action prior to taking complaints to the public[; and]

7. Whether a statement that was knowingly or recklessly false, if it were neither shown nor could reasonably be presumed to have harmful effects, would still be protected by the First Amendment.

*Sacks*, 465 A.2d at 988-89 (internal citations omitted). Of these factors, it appears that only the first four are pertinent here.

17

Regarding the first factor—whether the Department is prevented from efficiently carrying out its responsibilities because of the speech—the Department argues that Carr's comments threatened to erode the public's confidence in the Department. In support of this assertion, the Department relies on the Commission's characterization of Carr as being "capable of violent behavior and . . . clearly putting the bus driver and any other nearby motorists at risk."[16] (Adjudication at 18.) Using this questionable characterization, the Department argues that Carr's words equate to a reasonable prediction of disruption, which would prevent the Department from carrying out its goal of keeping the traveling public safe. This characterization and subsequent prediction, however, is a gross extrapolation of the content of Carr's comments. Despite the incendiary verbiage Carr used, the main thrust of her remarks centered on the fact that a bus driver consistently engaged in dangerous driving habits, thus necessitating Carr to take evasive maneuvers in response. Carr's comments served as a verbal manifestation of her frustrations in having to do so. Any resulting automobile accident would first be dependent on the bus driver's failure to drive his vehicle on the proper side of the road. (R.R. at 26a-27a, 120a, 122a.) In order for the Department to restrict speech that touches upon public concerns, it must direct the restriction at "speech that has some potential to affect the entity's operations." *Garcetti*, 547 U.S. at 418. A speculative

---

[16] The Department claims to have a reasonable belief that Carr is "capable of violent behavior" and that her comments "directly contradicted the Department's mission of ensuring safety on public highways." (Department's Br. at 28.) We note that other than Carr's Facebook posts in question, the Department offered no evidence that would establish Carr as a violent person or threat to public safety. If, however, the Department sincerely believed Carr posed a risk to the traveling public, one would think that the Department would have done more than merely terminate her employment. The record, however, does not reveal any other actions taken by the Department.

18

prediction based upon a mischaracterization of Carr's comments, however, does not rise to the level of potentially affecting the Department's operations.

Looking to the second factor, we consider whether Carr's speech impaired her ability to carry out her own responsibilities. At the hearing, both Chiappelli and Carr testified that Carr's comments did not affect her ability to perform any of her core job functions. (R.R. at 60a-61a, 116a-17a.) Accordingly, this factor must weigh in favor of Carr's interest in engaging in protected speech.

Similarly, the third pertinent factor—whether Carr's speech interfered with essential and close working relationships—also weighs in Carr's favor. At the hearing, Carr testified that her comments produced no adverse effects with her working relationships. (*Id.* at 117a-18a.) Chiappelli testified to the same, stating that he was not aware of any strained work relationships because of Carr's posts or subsequent removal. (*Id.* at 55a.)

Finally, we analyze the time, place, and manner in which Carr's speech occurred. As mentioned, Carr's original post and subsequent responses occurred on Facebook while she was off-duty and at home. The Department argues that Carr's use of social media causes this factor to weigh heavily in favor of the Department due to the broad audience that her comments reached. Further, the Department points to the fact that the place and manner in which Carr made her speech caused three individuals to report her to the Department's official Facebook page, which served to diminish the public's perception of the Department. While we agree that the resulting complaints are concerning, we also note the audience to which Carr spoke. The Facebook group to which Carr posted her comments, "Creeps of Peeps," is a group consisting of over 1,300 individuals from all over the world. (*Id.* at 133a.) At her pre-disciplinary conference, Carr intimated that she did not intend to post her

19

comments to that group and expressed uncertainty as to how its members saw her post. (*Id.* at 27a.) If Carr sought to discuss her concerns about a local bus driver, logic would dictate that a forum with members spanning the globe might not be the most effective arena in which to address these concerns and conduct a meaningful discussion. As such, this factor weighs in favor of the Department, albeit slightly.

After a thorough review of the record and a conscientious analysis of the factors articulated by the United States Supreme Court, we conclude that the Department's generalized interest in the safety of the traveling public does not outweigh Carr's specific interest in commenting on the safety of a particular bus driver. While Carr's comments are undoubtedly inappropriate, such comments still receive protection under the First Amendment. With the exception of a speculative prediction of future harm, the Department put forward no concrete evidence of tangible harm resulting from Carr's speech. As our Supreme Court opined in *Sacks*:

> There is a calculus of injury required in First Amendment government employee cases in which as the First Amendment interest in the speech rises, so does the government's obligation to react with caution, disciplining an employee, if at all, only when injury to the agency is more than speculative.

*Sacks*, 465 A.2d at 988. Here, the Department has not shown that its concerns rise to anything more than speculative.

Accordingly, we grant the Commission's application for summary relief as to the original jurisdiction claims against it and dismiss the Commission from this matter. As to the appellate jurisdiction portion of this matter, we reverse the Commission's Adjudication and remand the matter to the Commission with instruction that it reinstate Carr to her probationary status and that it exercise its discretion under Section 952 of the Act with regard to payment of salary or lost

20

wages.[17]   Count II of the Petition, which purports to assert a claim against the Department in this Court's original jurisdiction, remains pending before this Court.[18]

 

 

                                                        
P. KEVIN BROBSON, Judge

---

[17] Section 952 of the Act, pertaining to remedies, provides, in part:

> (b) Where such decision is in favor of the employe or the aggrieved person, the commission shall make such order as it deems appropriate to assure such rights as are accorded the individual under this act.

> (c) In the case of any employe removed, furloughed, suspended, or demoted, the commission may modify or set aside the action of the appointing authority. Where appropriate, the commission may order reinstatement, with the payment of so much of the salary or wages lost, including employe benefits, as the commission may in its discretion award.

[18] The Court hopes that this matter will serve as a cautionary tale to public and private sector employees regarding the pitfalls of social media. A discussion on social media is not transient. Indeed, although a user may delete a social media post from her personal page, modern technology can propel the post into a state of abject permanence on the Internet. Even when posting to the Internet anonymously, a user's identity is far from exempt from subsequent discovery and disclosure. *See Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 461-62 (3d Cir. 2015). Private employers exercise wide latitude in terminating employees for their social media posts. Fortunately for Carr, her employer's ability to react is constrained by rights afforded her under the United States and Pennsylvania Constitutions. Regardless, individuals should exercise great caution in posting to social media and always assume that social media posts can be viewed by the public, including current or future employers.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Rachel L. Carr,                               :
                    Petitioner                :
                                              :
        v.                                    :    No. 380 M.D. 2017
                                              :
Commonwealth of Pennsylvania,                 :
Department of Transportation and              :
Commonwealth of Pennsylvania,                 :
State Civil Service Commission,               :
                    Respondents               :

# **O R D E R**

AND NOW, this 12th day of June, 2018, it is hereby ordered that the application for summary relief filed by the State Civil Service Commission (Commission) as to the original jurisdiction claims against it is GRANTED, and the Commission is DISMISSED from this matter. It is further ordered that the Commission's adjudication and order is REVERSED, and the appellate jurisdiction portion of this matter is REMANDED to the Commission with instruction that the Commission reinstate Rachel L. Carr (Carr) to her probationary status and that the Commission exercise its discretion under Section 952 of the Civil Service Act, Act of August 5, 1941, P.L. 752, added by the Act of June 26, 1989, P.L. 47, 71 P.S. § 741.952, with regard to payment of salary or lost wages. Count II of Carr's petition for review, which purports to assert a claim against the Commonwealth of Pennsylvania, Department of Transportation in the Court's original jurisdiction, remains pending before this Court.

Jurisdiction relinquished with regard to the appellate portion of this matter.

_____
P. KEVIN BROBSON, Judge