IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| RACHEL L. CARR | : | No. 3 MAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court at No. 380 MD |
| | : | 2017 dated June 12, 2018, which |
| | : | reversed the adjudication of the State |
| COMMONWEALTH OF PENNSYLVANIA, | : | Civil Service Commission, entered |
| DEPARTMENT OF TRANSPORTATION | : | August 1, 2017, at Appeal No. 29058. |
| AND COMMONWEALTH OF | : | |
| PENNSYLVANIA, STATE CIVIL SERVICE | : | ARGUED:  September 12, 2019 |
| COMMISSION | : | |
| | : | |
| | : | |
| APPEAL OF: PENNSYLVANIA | : | |
| DEPARTMENT OF TRANSPORTATION | : | |

## OPINION

**JUSTICE MUNDY**                                            **DECIDED:  May 19, 2020**

We granted allowance of appeal in this matter to consider whether a government employer properly terminated a probationary employee based on messages she posted to a social networking website.  As set forth herein, we conclude that the Commonwealth Court failed to engage in the required balancing of interests, and therefore erred when it reversed the adjudication and order of the Pennsylvania State Civil Service Commission (Commission) dismissing the probationary employee's challenge to her termination.

Appellant, the Department of Transportation (Department) originally hired Rachel Carr as a seasonal/non-permanent employee, Clerk I.  It promoted her to the position of Roadway Programs Technician I, which she started on March 5, 2016.  Upon her promotion, Carr was subjected to a 180-day probationary period.  On May 24, 2016, Carr,

while off-duty and at home, posted a "rant" through her personal Facebook[1] account to the closed Facebook group "Creeps of Peeps."[2]  She also made several subsequent responses to comments made by members of the Facebook group to the original post.  Carr's Facebook profile identified her as a Roadway Programs Technician employed by the Department.  She originally posted the following:

> Rant: can we acknowledge the horrible school bus drivers?  I'm in PA almost on the NY boarder [sic] bear [sic] Erie and they are hella scary.  Daily I get ran [sic] off the berm of our completely wide enough road and today one asked me to t-bone it.  I end this rant saying I don't give a flying shit about those babies and I will gladly smash into a school bus[.]

N.T. Commission Hearing, 11/17/16, Ex. AA-7.  Some of her subsequent responses to comments included the following:

> If you see a vehicle coming perpendicular you [sic] with no turn signal on, do you pull out from your stop sign anyway?  Lmk when you're done googling perpendicular
>
> Good then, you don't?  Then they shouldn't either
>
> . . .
>
> And that's my problem?  They broke traffic law[s], which I'm abiding and I'm in the wrong?  Get fucked.  What world do you live in that I'd deliberate [sic] injure myself in stead [sic] of somebody else. [sic]  Didn't call myself a hero
>
> . . .

---

[1] Facebook is a social networking website.  "Users of that Web site may post items on their Facebook page that are accessible to other users, including Facebook 'friends' who are notified when new content is posted."  *Elonis v. United States*, 575 U.S. ___, 135 S.Ct. 2001, 2004 (2015).

[2] A closed or private group allows only current members to post, comment or share in the group.  "What are the privacy options for Facebook groups?" https://www.facebook.com/help/220336891328465 (last visited Jan. 22, 2020).

No I'm saying you don't care about the random fucks that drive your kids and are you serious?  Haha

. . .

I care about me.

. . .

Your children and your decision to chance them with a driver you've never been a passenger with is your problem.  A vehicle pulls out in front of me or crosses the yellow line, that's their problem.  A sedan, school bus or water truck.  You're [sic] kids your problem.  Not mine

*Id.*

Three members of the Creeps of Peeps group forwarded complaints to the Department's Facebook page, including screenshots of Carr's posts, and asked the Department to take responsive action.[3]  The complaints were forwarded to the Department's human resources office, which scheduled a pre-disciplinary conference. Following the conference, Carr was placed on suspension pending further investigation. Subsequently, the Department terminated Carr's employment due to inappropriate behavior.

Carr appealed to the Commission pursuant to Section 951(b) of the Civil Service Act (Act), alleging the Department violated Section 905.1 of the Act by terminating her employment for her exercise of her right to free speech.  Carr testified and offered the testimony of Robert Chiappelli, the Department's Human Resources Officer for the district.  The Department presented testimony from Anthony Reda, its Labor Relations Supervisor.  Chiappelli testified that he explains to all new employees the Department's expectations regarding their conduct, which includes off-duty conduct that has a nexus to

---

[3] One member of the group stated: "I hope there are consequences for for [sic] words." The second admonished: "You need to take care of this."  The third insisted: "Rachel Carr should be fired for this!"  N.T. Commission Hearing, 11/17/16, Ex. AA-7.

the Department and its mission. Chiappelli testified that Carr's Facebook posts undermined the Department's goal of ensuring safety for the public on Pennsylvania roads. He conceded her posts did not directly reflect an inability of Carr to perform her job function. Chiappelli testified that Carr was not treated differently by the Department than it has treated other employees in similar circumstances.

Reda, similarly testified that Carr's off-duty behavior and not her job performance constituted the reason for the termination of her employment. He explained that her posts affected the Department's image before the public and exposed the Department to potential liability should Carr act in a manner consistent with her posts. Reda also testified that the Department's disciplinary action against Carr was consistent with actions against similarly situated employees.

Carr testified that she never intended to act in accordance with her rant, which she described as a response to her frustration over the perceived unsafe driving by school bus drivers in her area. She expressed surprise that the tone of her post was of concern to the public. Given the reaction, however, she testified she would not post in that manner again.

The Commission affirmed the Department's termination of Carr's employment. Based on its findings, the Commission concluded as follows:

> [T]he Commission is at a complete loss to find any reasonable public interest in a rant about harming children or a bus driver. [Carr]'s remarks do not provide any educational information to the public or serve to inform them about any public matter. Furthermore, even if the Facebook rant contains an inkling of public interest, we find Chiappelli and Reda credible that [Carr] presented herself as an appointing authority employee and her rant completely disregards the basic safety mission put forth in its mission statement. [Carr]'s Facebook rant caused disruption to the appointing authority's reputation and mission that outweighed [Carr's] interest in her free speech. Thus, [Carr]'s Facebook rants do not constitute protected free speech.

Commission's Adjudication, 8/1/17, at 18-19 (citation omitted). The Commission also found that Carr did not present sufficient evidence that she had been treated differently from other employees whose off-duty remarks brought the Department's mission into disrepute. Carr filed a timely appeal to the Commonwealth Court.[4]

A unanimous three-judge panel of the Commonwealth Court reversed the adjudication of the Commission. *See Carr v. Dep't of Transp., et al.*, 189 A.3d 1 (Pa. Cmwlth. 2018).[5] Carr argued before the panel that the Commission erred in determining her postings did not qualify as protected speech. The Department argued that, to the contrary, the Commission correctly determined the postings were not protected speech. The panel noted the question of whether certain speech is constitutionally protected is a question of law. It stated its review is limited to whether Carr's constitutional rights were violated, whether the Commission committed an error of law, and whether its findings of fact are supported by the record. *See* 2 Pa.C.S. § 704.

The panel, citing a dearth of guiding case law from this Court, relied on federal cases prescribing the proper inquiry for courts addressing whether a government employee may be disciplined for speech-related conduct.[6] The panel noted the United States Supreme Court defined a two-part inquiry to determine if the employee's speech

---

[4] Carr also filed an action in the Commonwealth Court's original jurisdiction alleging that the Department violated her First Amendment right to free speech and that the Commission violated her right to due process. The Commonwealth Court granted summary relief to the Commission and dismissed it from the action. The original jurisdiction action against the Department remains pending in the Commonwealth Court.

[5] The panel correctly noted that "[a]lthough probationary civil service employees do not enjoy the same job security as regular status employees, they still enjoy the same constitutional rights as their regular status counterparts. Accordingly, Carr's status as a probationary employee is of no consequence to the instant matter." *Carr*, 189 A.3d at 10.

[6] The panel acknowledged this Court's decision in *Sacks v. Dep't of Pub. Welfare*, 465 A.2d 981 (Pa. 1983), discussed further infra, but noted it concerned only the second prong of inquiry balancing the interests of the parties.

is constitutionally protected. The first inquiry requires a determination of whether the speech involves a matter of public concern. *Carr*, 189 A.3d at 10-11 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). Speech implicates a "public concern" if its content or context addresses a matter of political, social, or other area of interest to the community. *Id.* at 11 (citing *Miller v. Clinton Cnty.*, 544 F.3d 542, 548 (3d Cir. 2008)). This contrasts with an employer's discipline for speech on matters of purely private interest, where there is no threat to debate of public issues. *Id.* (citing *Dun and Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 722 U.S. 749, 759-60 (1985)). If the speech is found to encompass a public concern, the second inquiry requires a determination of whether the speech has a potential to adversely affect the government employer's operation. This entails a balancing of the employee's free speech with the entity's interest in preventing impaired performance, morale, and workplace relationships. *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 151 (1983)).

Applying this inquiry to the instant case, the panel noted Carr maintained that her post was a statement of her opinion of the quality of the area's school bus drivers and the risk they presented to the traveling public. The Department argued her posts reflected merely her own frustration with a single incident by a specific driver, and thus embodied only private concerns. The panel determined the Commission erred in finding Carr's original post did not involve a matter of public concern. The panel concluded Carr's original post sought acknowledgement of the generally poor quality of the school bus drivers in the area. Her reference to a specific incident arose in her responses to comments made to the original post. While the panel found Carr's tone and intimations to be reprehensible, it noted that violent or objectionable speech does not negate its characterization as addressing a public concern. *Id.* at 12 (citing *Rankin v. McPherson*, 483 U.S. 378 (1987)).

The panel next addressed whether the Department nevertheless had a sufficient justification for treating Carr differently from a member of the general public with respect to consequences for her speech. For this question, the panel looked to this Court's decision in *Sacks*. Therein, relying on United States Supreme Court precedent, we identified a list of factors a court must consider in resolving this second prong of the inquiry. The panel determined the following four factors were pertinent to the instant case.

> 1. Whether, because of the speech, the government agency is prevented from efficiently carrying out its responsibilities;
>
> 2. Whether the speech impairs the employee's ability to carry out his own responsibilities;
>
> 3. Whether the speech interferes with essential and close working relationships;
>
> 4. The manner, time and place in which the speech occurs.

*Carr*, 189 A.3d at 13 (quoting *Sacks*, 465 A.2d at 988-989).[7]

The Department argued that Carr's posts demonstrated she was "capable of violent behavior" and of putting others at risk. *Id.* at 14. This, the Department claimed,

---

[7] The remaining factors identified in *Sacks*, and found to be inapplicable to the instant case by the panel, are the following.

> 5. Whether the speaker is in a position in which the need for confidentiality was so great as to justify dismissal for even completely accurate public statements[;]
>
> 6. Whether narrowly drawn grievance procedures required submission of complaints about the operation of the agency to superiors for action prior to taking complaints to the public[; and]
>
> 7. Whether a statement that was knowingly or recklessly false, if it were neither shown nor could reasonably be presumed to have harmful effects, would still be protected by the First Amendment.

*Id.* at 13-14 (quoting *Sacks*, 465 A.2d at 988-89).

would adversely affect its ability to meet its goal of public safety on the roads. The panel concluded the Department's characterization of the speech and its supposed effect were an unsupportable extrapolation. Carr's posts did not threaten violence, and despite their "incendiary verbiage," *id*. at 14, were an expression of frustration over the potential consequences of a bus driver failing to abide by traffic laws. The panel found the Department's assertions to be too speculative to justify its actions under the first factor. The panel then noted there was no dispute that Carr's posts did not affect her ability to perform her job functions and did not impact her workplace relationships. As to the time, place and manner of Carr's speech, the panel concluded the posting in a Facebook group weighed only slightly in the Department's favor given the exposure and reactions the comments encountered. The panel then weighed the factors, concluding that "the Department's generalized interest in the safety of the traveling public does not outweigh Carr's specific interest in commenting on the safety of a particular bus driver." *Id*. at 15. Accordingly, the panel reversed the adjudication of the Commission and remanded with instruction to reinstate Carr to her prior employment status.

The Department sought allowance of appeal, which we granted to address the following issues:

> 1. Is the Commonwealth Court's decision in conflict with the U.S. Supreme Court's rulings in *Pickering* [*v. Bd. of Educ. of Twp. High Sch. Dist.*, 391 U.S. 563 (1968)] and its progeny, which allow a government employer to terminate an employee on the basis of their speech, even when it touches upon a matter of public concern, so long as the employer can demonstrate that an adverse effect could be reasonably foreseen?
>
> 2. Did the Commonwealth Court err as a matter of law by failing to give sufficient weight to the public importance, or lack thereof, of Carr's Facebook comments, as required by *Pickering* and its progeny?
>
> 3. Did the Commonwealth Court err as a matter of law by failing to give sufficient weight to the public importance, or lack thereof, of Carr's Facebook comments, as required by the Pennsylvania Supreme Court in *Sacks* [*v. Dep't of Pub. Welfare*, 465 A.2d 981 (Pa. 1983)]?

*Carr v. Dep't of Transp., et al.*, 200 A.3d 435 (Pa. 2019).

The Department notes that the United States Supreme Court employs a balancing test when considering the government's interests as an employer and the free speech rights of government employees. In *Pickering*, a public school teacher was dismissed after sending a letter to the editor of a local newspaper criticizing the School Board and superintendent for their handling of past revenue raising measures. Pickering's dismissal was affirmed by the Circuit Court of Will County, Illinois "on the ground that the determination that appellant's letter was detrimental to the interests of the school system was supported by substantial evidence and that the interests of the schools overruled appellant's First Amendment rights." *Pickering*, *supra* at 564. The Supreme Court of Illinois affirmed. In reversing, the United States Supreme Court recognized:

> [T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at the balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering*, 391 U.S. at 568. Concluding that Pickering's statements, which were "critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally," *id*, at 572-73, the Court held that the administration did not have a greater interest in regulating Pickering's speech than that of any other member of the public.

The Department further relies on *Connick*, *supra*, where New Orleans Assistant District Attorney Sheila Myers, who opposed a planned job transfer, expressed her

opposition to her supervisors, including District Attorney Harry Connick. After receiving notification of the transfer, she discussed the issue and other office-related matters with Dennis Waldron, one of the first assistant district attorneys. When Waldron told her that others in the office did not share her concerns, she told him she would research the matter further.

The following day, Myers met with District Attorney Connick, who asked her to accept the transfer. She told him she would consider it, and Connick then left the building. Shortly thereafter, Myers circulated a survey to fifteen assistant district attorneys seeking their views on "office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id.* at 141. Once Waldron found out about the survey, he contacted the District Attorney to let him know that a "mini-insurrection" was taking place within the office. Connick returned to the office and told Myers she was being terminated for refusing the transfer. She was also informed that distributing the questionnaire was an act of insubordination, and that Connick objected, *inter alia*, "to a question concerning pressure to go to work in political campaigns which he felt would be damaging if discovered by the press." *Id.*

Myers filed suit under 42 U.S.C. § 1983, alleging that she was terminated for exercising her right of free speech. The federal district court agreed, noting that although Connick told Myers she was terminated for refusing the transfer, the questionnaire was the real reason for the termination. The court determined that the questionnaire involved matters of public concern and that the state failed to establish the survey substantially interfered with the operations of the District Attorney's Office. *Myers v. Connick*, 507 F.Supp. 752 (E.D.La. 1981). The Fifth Circuit Court of Appeals affirmed without a reported opinion. *Myers v. Connick*, 654 F.2d 719 (5th Cir. 1981) (table).

The United States Supreme Court reversed, noting that the sole issue raised in the questionnaire that involved a matter of public concern was whether assistant district attorneys felt pressure to work on political campaigns of candidates supported by the office. Due to the presence of this issue, the Court concluded that application of the *Pickering* balancing test was appropriate. However, the Court recognized that Myers' survey 'touched upon matters of public concern in only a most limited sense." *Myers*, 461 U.S. at 154. For this reason, the Court held that the "First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." *Id.*

The Department further notes that in *Grutzmacher v. Howard County*, 851 F.3d 332 (4th Cir. 2017), the court applied the *Pickering* analysis to online speech, when a battalion chief of the Howard County, Maryland Department of Fire and Rescue Services posted a statement about gun control legislation on his Facebook page suggesting, "lets [sic] all kill someone with a liberal . . . then we can get them outlawed too! Think of the satisfaction of beating a liberal to death with another liberal." *Id.* at 338. The employee also "liked," and wrote favorably about a comment containing racial overtones that someone made in response to the original post. The employee removed the posts at the direction of his supervisor.[8]

Following the employee's termination, he filed suit against the employer. After discovery was completed, the federal district court granted summary judgment in favor of the employer. On appeal, Fourth Circuit Court of Appeals concluded that the employee's Facebook posts regarding gun control and the employer's social media policy were matters of public concern. Therefore, it had to determine whether the employee's interest

---

[8] The employee subsequently posted statements critical of his supervisor and his employer, which the court determined "did not implicate matters of public concern." *Grutzmacher*, 851 F.3d at 343.

in speaking on matters of public concern outweighed the government's interest in "providing effective and efficient services to the public." *Grutzmacher*, 851 F.3d at 344-45 (citing *McVey v. Stacy,* 157 F.3d 271, 277 (4th Cir. 1998)). The Court recognized that "to demonstrate that an employee's speech impaired efficiency, a government employer need not prove that an employee's speech actually disrupted efficiency, but only that an adverse effect was reasonably to be apprehended." *Id.* (citation omitted). Relevant to the instant matter, the Court noted that "[a] social media platform amplifies the distribution of the speaker's message - which favors the employee's free speech interests - but also increases the potential, in some cases exponentially, for departmental disruption, thereby favoring the employer's interest in efficiency." *Id.* (quoting *Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016)).

Balancing the parties' interests, the Court concluded that the employer prevailed for several reasons including the fact that the plaintiff's "Facebook activity interfered with and impaired [the employer's] operations and discipline as well as working relationships within the [organization]." *Id.* at 345. The Court further recognized that the employee's "speech frustrated the [Fire] Department's public safety mission and threatened 'community trust' in the [Fire] Department, which is 'vitally important' to its function." *Id.* at 346 (citations omitted).

Here, the Department asserts that "[t]he ultimate aim of the *Pickering* test is to balance the interests of the employee, speaking as a citizen, with that of the government, acting as an employer, 'in promoting the efficiency of the public services it performs through its employees.' *Pickering*, 391 U.S. at 568." Appellant's Brief at 18. It further argues that the Commonwealth Court failed to consider the government's determination that Carr's comments had the potential to erode public confidence in the Department and undermine its mission of promoting highway safety. *Id.* at 18-19. The Department

criticizes the court for giving short shrift to the Commission's characterization of Carr as being "capable of violent behavior and . . . clearly putting the bus driver and any other nearby motorist at risk." Commission's Adjudication at 18. Rather, the court concluded that such characterization was speculative because Carr's posts simply indicated her frustration at the bus driver's dangerous driving habits which caused her to take evasive measures.

The Department notes that "[t]he proper inquiry, under *Pickering* and its progeny, is whether Carr's speech could reasonably be said to adversely affect the Department's interest as an employer. *See Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality opinion) (U.S. Supreme Court gave 'substantial weight to government employer's reasonable predictions of disruption')." Appellant's Brief at 19. Carr's rant disregarded the core mission of the Department, which is to provide safe highways to the traveling public. *Id.* at 20. Furthermore, by referencing her employment on her Facebook page and within the comments, she brought the Department into her rants. *Id.* Carr's comments that she does not "give a flying shit about those babies and [] will gladly smash into a school bus," are contrary to the Department's core mission. *Id.* at 21. "The over-the-top nature of her comments have the potential to corrupt the public's confidence and trust in the Department and its employees." *Id.* Noting that *Pickering* simply requires that any harm to the public employer be reasonably likely to occur, the Department asserts it reasonably concluded that in light of Carr's post, she might strike a school bus with a vehicle. *Id.*

The Department argues that Carr's posting of her rants to a Facebook group with 1,395 members aggravated the harm it sustained pursuant to *Grutzmacher*, *supra*, where the Fourth Circuit Court of Appeals recognized "the undeniable reality that online speech magnifies a speaker's message and, in turn, the potential harm of the speech." *Id.* at 22.

Noting that multiple individuals contacted the Department through social media to complain about Carr's posts, the Department emphasizes that it was "reasonable . . . to believe that her comments could have a negative impact on its interest as an employer and as stewards of the public's trust." *Id.* at 23. Focusing on the totality of the circumstances, "a reviewing court should affirm an adverse employment action so long as the potential harm to the employer rises above mere speculation." *Id.* at 25.

Noting "the government employer's right to protect its own legitimate interests in performing its mission," *City of San Diego v. Roe*, 543 U.S. 77, 82 (2004), the Department asserts that rather than waiting for harm to arise, it was justified in taking "proactive steps to prevent any reasonably foreseeable harm that may arise from an employee's speech." Appellant's Brief at 25-26.

The Department next argues that the Commonwealth Court erred by failing to consider the minimal public importance of Carr's comments when balancing her free speech interests against the interests of her employer. In *Pickering*, the Court noted the question of school funding is a matter of public concern about which teachers are "the members of the community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent." *Pickering*, 391 U.S. at 572. Here, the Department asserts that the Commonwealth Court did not adequately address the weight or lack thereof to be given to Carr's comments under the *Pickering* analysis. Instead, once the court determined that her comments touched on a matter of public concern, it found she had a "specific interest in commenting on the safety of a particular bus driver. *Carr*, 189 A.3d at 15." Appellant's Brief at 28-29. The Department asserts that the Commonwealth Court failed to consider the absence of societal interests involved in Carr's Facebook posts despite recognizing that her comments were "a verbal

manifestation of her frustrations," in having to take evasive maneuvers in response to the bus driver's dangerous driving habits. Appellant's Brief at 29 (citing *Carr*, 189 A.3d at 14).

The Department points out that the United States Supreme Court "has acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Garcetti*, 597 U.S. at 419. However, the Department suggests that such was not the case here because "Carr's position with the Department did not provide her with any insight into school bus safety nor was she well-informed as to the topic. There is little to no public interest in her personal frustrations." Appellant's Brief at 29. By not taking into consideration the lack of societal interest in Carr's Facebook posts, the Department asserts that the Commonwealth Court failed to properly weigh the First Amendment interests involved, as required by *Pickering*. The Department maintains that when Carr's First Amendment interests are weighed against its interests as an employer, the scales tip in its favor due to the importance of it maintaining the public's trust and confidence. *Id.* at 30.

The Department next asserts that the Commonwealth Court's decision is contrary to this Court's holding in *Sacks v. Dep't of Pub. Welfare*, 465 A.2d 981 (Pa. 1983), wherein a Department of Public Welfare (DPW) employee, Steven Sacks, spoke as a private citizen at a public hearing held by the Health Systems Agency of Southeastern Pennsylvania (HSA). Among his comments, he stated that one Medical Assistance contractor, the Philadelphia Health Management Corporation (PHMC), which is a non-profit entity, had made a profit of $768,000 from a child health screening program. He referred to this as "an apparent ripoff." *Id.* at 983. He also pointed out that employees of DPW were members of the board of PHMC. In response, DPW suspended Sacks for ten days. The Commission upheld the suspension, which the Commonwealth Court affirmed. However, on further appeal, this Court reversed, noting that Sacks' testimony contained

both "a fact component and a value or opinion component." *Id.* at 985. The fact component was accurate. Furthermore, "Sacks' view that the surplus was improper and the joint involvement was questionable was a value judgment on which reasonable minds could disagree." *Id.* at 985-86.

Upon review of *Pickering* and *Connick*, this Court concluded "[t]here is a calculus of injury required in First Amendment government employee cases in which as the First Amendment interest in the speech rises, so does the government's obligation to react with caution, disciplining the employee, if at all, only when injury to the agency is more than speculative." *Id.* at 988. When analyzing a public employee First Amendment case, the court should consider: (1) the public importance of the speech; (2) the nature of the injury to the agency; and (3) factors which may mitigate or aggravate the injury to the agency. *Id.* at 989.

With respect to the first element, the *Sacks* court emphasized:

> As the public importance of the speech increases, the government's difficulty of justifying disciplinary action taken against the employee because of the speech will increase proportionately, and as the public importance of the speech decreases, the government's burden of showing injury before it may discipline an employee, for First Amendment purposes, will proportionately decrease.

*Id.*

Here, the Department asserts that the Commonwealth Court's decision failed to adequately address the factors set forth in *Sacks*. It argues that although the court concluded Carr's comments involved a matter of public concern, it erred by ignoring the lack of any public importance in those comments. Appellant's Brief, at 33. The Department notes that Carr herself described the comments as a "rant" against a school bus driver in her area, and it draws our attention to the Commission's statement that it could not "find any reasonable public interest in a rant about harming children or a bus

driver." Commission's Adjudication, 8/1/17, at 18. As noted, unlike the employees in *Pickering* and *Sacks*, Carr's position did not provide her with special knowledge regarding a matter of public concern, in this case, school bus safety.

The fact that Carr posted her message to a Facebook group whose members were not primarily residents of the area where she lived lessens the public importance of her remarks according to the Department. Appellant's Brief at 36. The Commonwealth Court recognized, "logic would dictate that a forum with members spanning the globe might not be the most effective arena in which to address these concerns and conduct meaningful discussion." *Carr*, 189 A.3d at 15.

As the Department notes, the comments following Carr's initial post were not the "well-informed views of government employees engaging in civic discussion." *Garcetti*, 547 U.S. at 419. Given the minimal importance of Carr's speech for First Amendment purposes, the Department asserts that pursuant to *Sacks*, its interest in preventing employees from making inflammatory comments that have the potential to erode public trust and confidence in its mission justifies disciplining Carr.

Carr recognizes the relevance of *Pickering*, *Connick*, and *Sacks* to the instant matter, emphasizing that the Commonwealth Court found her speech involved an issue of public concern. She suggests that our analysis of the factors outlined in those cases should be informed by *Rankin v. McPherson*, 483 U.S. 378 (1987), and *Grutzmacher v. Howard County*, 851 F.3d 332 (4th Cir. 2017). Carr notes that in *Rankin*, *supra*, a deputy constable, Ardith McPherson, upon hearing of an assassination attempt against the President of the United States, said to a coworker, "if they go for him again, I hope they get him." *Id.* at 381. The remark was overheard by another deputy constable who reported it to Constable Walter Rankin, who fired McPherson. McPherson filed an action challenging her termination in federal district court, which ruled that her statements were

not protected speech. The Fifth Circuit Court of Appeals reversed. In affirming that decision, the United States Supreme Court noted that McPherson's duties were limited to data entry, and that all employees of the Constable's Office were designated as deputy constables regardless of the nature of their work. *Id.* at 380-81. The Court concluded:

> [McPherson's] duties were purely clerical and were limited solely to the civil process function of the Constable's office. There is no indication that she would ever be in a position to further - or indeed to have any involvement with - the minimal law enforcement activity engaged in by the Constable's office. Given the function of the agency, McPherson's position in the office, and the nature of her statement, we are not persuaded that Rankin's interest in discharging her outweighed her rights under the First Amendment.

*Id.* at 391.

Carr also draws our attention to *Grutzmacher*, *supra*, where the Fourth Circuit Court of Appeals concluded that "the Department's interest in efficiency and preventing disruption outweighed Plaintiff's interest in speaking in the manner he did regarding gun control and the Department's social media policy." *Grutzmacher*, 851 F.3d at 345. The court held that the battalion commander's posts interfered with Department operations and discipline; conflicted with his responsibilities; frustrated the Department's public safety mission and threatened the community's trust in the Department and upset the chain of command. *Id.* at 345-47.

Carr maintains that the Department erroneously asserts that her posts created a significant potential to erode the public's trust in the organization, and that they undermined the Department's core safety mission. She notes that her initial comments were in response to a school bus driver's unsafe driving, and echoes the Commonwealth Court's observation that she herself did not engage in unsafe driving practices. Rather, it was the bus driver who forced her into taking measures to avoid harm. Appellee's Brief at 20. Contrary to the Department, which characterizes her comments as indicative of

violent tendencies, Carr, like the Commonwealth Court, characterizes her comments as simply a "verbal manifestation of her frustrations" at having to take evasive action due to the poor skills of the driver entrusted with transporting school children. *Carr*, 189 A.3d at 14. She emphasizes that in her Facebook post she does not threaten to violate traffic laws, and that contact between her vehicle and a school bus would only occur as a result of the unsafe driving of the school bus driver. Appellee's Brief at 20-21. She further asserts that any harm to the Department is speculative, and that complaints raised by the public "do not indicate any mistaken association that her comments reflect those of the Department." *Id.* at 21. Additionally, in the days following her posts, Carr's working relationships were not affected, her job performance did not decline, nor did the Department experience any decline in the delivery of its services. *Id.*

Carr argues that the Department erroneously seeks to "place[] the issue of 'touching on a matter of public concern' . . . into the balancing test between an employee's interest in speaking weighed against the government's interest as an employer." *Id.* at 22. She asserts that once the court determines that the employee's speech involves a matter of public concern, as it did here, it should then proceed to the *Pickering* balancing test and consideration of the *Sacks* factors.

We turn first to the question of whether the Commonwealth Court's decision conflicts with controlling decisions that a government employer may terminate an employee for speech that touches on a matter of public concern if it can demonstrate that an adverse effect could be reasonably foreseen.[9] Here, the Commonwealth Court held that "the Department's generalized interest in the safety of the traveling public does not outweigh Carr's specific interest in commenting on the safety of a particular bus driver."

---

[9] "As the issues presented concern constitutional questions, our standard of review is de novo and our scope of review is plenary." *Pa. State Ass'n of Jury Comm'rs v. Commonwealth*, 78 A.3d 1020, 1028 (Pa. 2013).

*Carr*, 189 A.3d at 15. It further noted that "[w]ith the exception of a speculative prediction of future harm, the Department put forward no concrete evidence of tangible harm resulting from Carr's comments." *Id.*

It is well-settled that the state has a heightened interest in regulating the speech of its employees. *Pickering*, 391 U.S. at 568. "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti*, 547 U.S. at 418. As the United States Supreme Court has recognized:

> Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to the agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her.

*Waters v. Churchill*, 511 U.S. 661, 674-75 (1994) (plurality opinion). The Court subsequently held:

> [T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.

*Connick*, 461 U.S. at 151 (quoting *Arnett v. Kennedy*, 416 U.S. 134, 168 (1974) (J. Powell, concurring in part)).

"To demonstrate that an employee's speech impaired efficiency, a government employer need not prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was reasonably to be apprehended." *Grutzmacher*, 851 F.3d at 345 (quotations and citations omitted). *See also Garcetti*, 547 U.S. at 418 (explaining

when government acts as employer, "the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations").

With regard to the Commonwealth Court's concern regarding "the speculative prediction of future harm," *Carr*, 189 A.3d at 15, it is important to note the following observation by the United States Supreme Court:

> [W]e have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large. Few of the examples we have discussed involve tangible, present interference with the agency's operation. The danger in them is mostly speculative. . . . But we have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern, and even though when the government is acting as sovereign our review of legislative predictions of harm is considerably less deferential.

*Waters*, 511 U.S. at 673 (plurality opinion). As subsequently stated by the Court, "we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152. The Third Circuit Court of Appeals has also recognized that "[t]he government need not show the existence of actual disruption if it establishes that disruption is likely to occur because of the speech." *Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454 (3d Cir. 2015).

Reviewing Carr's Facebook posts, the Commonwealth Court suggests that Carr was simply expressing her frustrations about having to take evasive measures due to a bus driver's dangerous maneuvers. Accordingly, it found that harm to the Department was speculative. *Carr*, 189 A.3d at 14. However, the relevant question is whether Carr's speech could reasonably be said to adversely affect the Department's interest as an employer. *See Waters*, *supra.* Even if Carr never intended to drive her vehicle into a

school bus, if her words alone could erode the public's trust in her employer's mission, the Department acted reasonably in terminating her employment. Carr identified herself as a Department employee in her Facebook profile and in her posting. The record establishes that safety is the core mission of the Department. As its Human Resources Officer testified:

> Representing the Department of Transportation in her profile and then talking about Transportation during her posts, this is not the view of the Department. The view of the Department is not to hurt any individual or the traveling public. We do everything to reduce risks to the traveling public in terms of all the safety items that we are associated with. In fact, we have driver safety trainings, we have school bus safety trainings, which is typically an outreach of our department, but there's no way that we want to be in any line of thinking that our department employees don't care about traffic laws and that they would intentionally hurt somebody.

N.T. Commission Hearing, 11/17/16, at 67-68.

Clearly, few statements could be more contrary to the Department's mission of providing safe roadways for the traveling public than Carr's comment, "I don't give a flying shit about those babies and I will gladly smash into a school bus." *Id.* at Ex. AA-7. Furthermore, the fact that the Department received complaints via social media about Carr's posts highlights the reasonableness of its concerns regarding the loss of public trust. Accordingly, the Commonwealth Court erred in its analysis of the question "[w]hether, because of the speech, the government agency is prevented from efficiently carrying out its responsibilities." *Sacks*, 465 A.2d at 981 (citing *Connick*, 461 U.S. at 150-51).

The Department also asserts that the Commonwealth Court erred by focusing solely on the existence of an issue of public concern without considering the importance, or lack thereof, of the speech involved. Here, the Commonwealth Court concluded that Carr's posts addressed a matter of public concern, namely, "an attempt to discuss her

frustrations toward the poor driving habits of an individual entrusted to safely transport school children." *Carr*, 185 A.3d at 12. Having determined that Carr met the threshold requirement of raising an issue of public concern, it proceeded to examine the four factors identified in *Sacks* for determining if discipline is appropriate:

> 1. Whether, because of the speech, the government agency is prevented from efficiently carrying out its responsibilities;
>
> 2. Whether the speech impairs the employee's ability to carry out his own responsibilities;
>
> 3. Whether the speech interferes with essential and close working relationships;
>
> 4. The manner, time and place in which the speech occurs.

*Carr*, 189 A.3d at 13 (quoting *Sacks*, 465 A.2d at 988-989). The court engaged in no further consideration of the nature of the speech itself when balancing Carr's interests, "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

In *Sacks*, this Court held that when applying the considerations listed above, "to the analysis of a public employee First Amendment case, a court should consider: I. the public importance of the speech; II. the nature of the injury to the agency; III. factors which may mitigate or aggravate the injury to the agency." *Sacks*, 465 A.2d at 989. The Court proceeded to note:

> As the public importance of the speech increases, the government's difficulty of justifying disciplinary action taken against the employee because of the speech will increase proportionately, and as the public importance of the speech decreases, the government's burden of showing injury before it may discipline an employee, for First Amendment purposes, will proportionately decrease.

*Id.* Here, the Commonwealth Court's failure to consider the importance of Carr's speech is contrary to *Sacks*, and thus an error of law which undermines its conclusion that Carr's interest in commenting on the safety of a particular bus driver outweighs the Department's interest in the safety of the public. *Carr*, 189 A.3d at 15.

The Commonwealth Court's conclusions with respect to the following *Sacks* factors are not in dispute: Carr's speech did not affect her ability to perform her core duties; Carr's speech did not adversely affect her working relationships; and with regard to the time, place and manner of Carr's speech, her decision to post to the Creeps of Peeps Facebook group weighs in favor of the Department. *Id.* at 14-15. However, in light of our conclusion, *supra*, that Carr's speech prevented the Department from efficiently carrying out its responsibilities, it is evident that when weighing the factors, the Commonwealth Court erred in concluding that "the Department's generalized interest in the safety of the traveling public does not outweigh Carr's specific interest in commenting on the safety of a particular bus driver." *Id.* at 15. This is especially so when the public importance of the speech is considered, as required by *Sacks*.

The United States Supreme Court has "acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Garcetti*, 547 U.S. at 419. *Pickering* and *Sacks* both involved employees who by virtue of their positions and experience had specialized knowledge regarding matters of public concern. While there is no present dispute whether Carr's comments touched on a matter of public concern, they were essentially a rant based on her personal observation of a particular bus driver rather than an explanation of safety concerns that she became aware of as a Department employee. In light of the limited public importance of Carr's posts, *see Sacks*, and their detrimental

effect on the Department, the Commonwealth Court erred in reversing the decision of the Commission.

Accordingly, the order of the Commonwealth Court is reversed.

Chief Justice Saylor and Justices Baer, Todd, Donohue and Wecht join the opinion.

Justice Wecht files a concurring opinion in which Justice Dougherty joins.